THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE NUNEZ, Defendant-Appellant.

First District (5th Division)   No. 1—93—0490

Opinion filed May 13, 1994.

Jeffrey C. Pattee, of Pattee & Braverman, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Marci Jacobs, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MURRAY delivered the opinion of the court:

Defendant, Jose Nunez, was charged with attempted first degree murder, armed violence, aggravated battery with a firearm, and two counts of aggravated battery. At a bench trial, defendant was found guilty of all charges except attempted murder. Defendant was sentenced to 14 years in the Illinois Department of Corrections and three years' mandatory supervised release.

Prior to trial, defense counsel did not present any motions to suppress. At the start of trial, both the prosecutor and defense counsel waived opening statements. The prosecutor then called Roberto Jacobo as the State's first witness.

Roberto Jacobo (Jacobo) testified that on September 5, 1991, at approximately 3:35 a.m., he was driving his father's car in the area of 3700 South Hermitage with James Davis (Davis) and Greg Episodo (Greg). Greg was sitting in the front passenger seat and Davis was sitting in the back seat. The three men went to look for Greg's girlfriend.

When they arrived at 3700 South Hermitage, they spotted Nunez and Yvonne walking. While Greg and Nunez had words, Nunez, struck or attempted to strike Davis. "[Davis] had held his hand and somehow either [Davis] let him go or he got away and he backed off and he [Nunez] started shooting." Yvonne was next to Nunez when he fired the weapon. Nunez fired the weapon two or three times.

Jacobo doesn't recall if he got hit the first time Nunez fired the weapon. However, Jacobo was struck by a bullet in the jaw which lodged in his right shoulder area. After Jacobo was shot, he drove around the corner. He told Davis he was shot. Davis scooped him over and took over the wheel. Davis drove Jacobo first to his father's house, then to the hospital. Surgery was performed immediately and Jacobo remained in the hospital from Friday morning until Sunday morning.

After leaving the hospital at approximately 2 a.m. Sunday morning, he went to the police station. At the police station, he was questioned. Subsequently, the police took him for a ride. At approximately 2:30 a.m., they drove in the area of 3617 South Hermitage. At that time he saw Nunez.

Jacobo testified that he was currently serving time in the penitentiary. He had been sentenced to three years in prison for possession of a controlled substance and four years for possession of a stolen motor vehicle. He had also been previously convicted of forgery and theft.

No one exited the vehicle when Nunez swung at Davis in the

back seat. None of the occupants of his vehicle got out of the car prior to the shooting.

On cross-examination Jacobo testified that he was aware that Nunez lived at 3617 South Hermitage. On the night of September 5, 1991, at approximately 3:35 a.m., he was going to Nunez's house looking for Nunez and Yvonne. He was not aware at the time that Nunez and Yvonne were dating. He did not call Nunez over to the car. Greg had words with Nunez after Greg and Yvonne had had a few words.

Greg and Nunez did not have an argument. Jacobo stated:

"It was like Greg had said something, 'Are you with her now,' and he's like, Mr. Nunez [sic] like, 'She's with me now. You got a problem with that?' And that was it."

Once this was said, Jacobo thought everything was smooth. He stayed there. At that point Greg did nothing. Then Nunez walked towards the car and struck Davis. Davis did not say anything to Nunez. Jacobo had been drinking beer that evening. The car Jacobo was driving was a two-door, 1978 Cutlass. In order for Nunez to swing at Davis through the window, he had to go past Greg, who was sitting in the front seat.

Davis testified that on September 5, 1991, at about 3:30 a.m., he was in the area of 3700 South Hermitage with Jacobo and Greg. Jacobo was driving and Greg was seated in the passenger seat. Davis wasn't aware why they went to that location. After they picked him up, they picked up a six-pack. They were driving around and "they pulled over there and had an argument." When they pulled over at 3700 Hermitage he saw Nunez and Yvonne. He knew Yvonne prior to that date because Greg and Yvonne had been going together since grammar school. At that time Davis was not aware of a relationship between Yvonne and the defendant.

Greg and Nunez were arguing back and forth. Nunez had told Greg to leave, but they didn't. Nunez took a swing at Davis and Davis blocked it by grabbing his wrist. With his other hand, the defendant pulled out a revolver. When he saw the revolver, Davis told Jacobo to pull away. Jacobo was speaking in Spanish and Davis did not understand what they were saying at the time. A few seconds later the vehicle moved and a bullet came through the back window. One or two shots were fired and as far as he knew Nunez was firing the weapon. Immediately after the shots were fired, Davis looked in the back window. The bullet went right past Davis. Jacobo turned his head to look out the back window and caught a bullet inside the cheek. After Jacobo was hit, he drove the car around the corner. Greg jumped out of the car. Davis pushed Jacobo over to the side and drove him straight to the hospital. Subsequently, Davis stated that

he stopped at Jacobo's parents house first and then went straight to the hospital.

Davis stated that he had two previous burglary convictions and a conviction for possession of a controlled substance. In addition, he received a three-year sentence in the Illinois Department of Corrections for burglary and possession of a stolen motor vehicle.

On cross-examination Davis testified that he did not know what was going to happen when they pulled up and saw Nunez and Yvonne on the street. To his knowledge, Greg opened the car door, but never got out of the car. Davis stated that he probably drank 12 cans of beer that evening. Defense counsel asked if Davis had been smoking something called wicked stick or happy stick, to which Davis replied no. To Davis' knowledge Jacobo did not drive about 10 feet up and then stop and start to back up.

On examination by the court, Davis testified that one or two shots were fired. He was positive one shot was fired because it came right past the side of his head. All shots were fired as the car was pulling away.

Detective Nick Crescenzo testified that at approximately 2 a.m., on September 10, 1991, Jacobo and Davis came into his office relative to a shooting that occurred at about 3:35 a.m. on September 5, 1991, at 3700 South Hermitage. Jacobo directed him to a front porch in the area of 3617 Hermitage, where Jacobo stated he had seen the man that shot him. At that location Detective Crescenzo saw the defendant. Jacobo identified the defendant as the man that had shot him in the face on September 5, 1991. Detective Crescenzo placed the defendant under arrest and took him to Area 3 Headquarters. At about 3:30 a.m., in the presence of Assistant State's Attorney Doug Wynne (ASA Wynne), he interviewed the defendant concerning the September 5, 1991, shooting. Before the interview was conducted, ASA Wynne advised the defendant of his rights per *Miranda*. After their conversation ASA Wynne took a handwritten statement which the defendant read, stated he understood, and signed.

Defense counsel objected to Detective Crescenzo being the proper person to lay a foundation for the defendant's statement. The trial court overruled the objection.

Detective Crescenzo stated he was present when the statement was prepared and signed. He identified the defendant's statement. He witnessed the signatures on both pages of the document and stated that defendant, ASA Wynne, and himself each initialed a correction on the first page.

On cross-examination by defense counsel, Detective Crescenzo testified that prior to the time that Jacobo came into the police

station he had not been assigned to this case, and in fact, up until Jacobo walked into the station at 2 a.m, he did not have any knowledge of the case. Jacobo told him that he had seen the person who shot him sitting on a porch located at 3600 South Hermitage. The first time Detective Crescenzo drove past the porch he did not see the defendant. Detective Crescenzo drove around approximately 15 or 20 minutes before he returned to the defendant's address.

Detective Crescenzo spoke with the defendant before ASA Wynne arrived. Detective Crescenzo advised the defendant of his constitutional rights and the defendant gave him a brief synopsis of what had transpired. After Nunez had told his side of the story, ASA Wynne then wrote down a summary of what had been said.

On redirect, Detective Crescenzo stated that the first time he drove by 3617 Hermitage, Jacobo stated that the man that shot him wasn't there now.

The two-page handwritten statement of the defendant was entered into evidence. Both pages of the statement are signed by Nunez, Detective Crescenzo, and ASA Wynne. One change was made on the first page and initialed by the above three persons. The statement indicates that Nunez had not taken any drugs or alcohol within the preceding 24 hours. Nunez stated that Greg and two other guys came to 3600 South Hermitage. Greg was calling Nunez's nephew a liar and then started yelling at Yvonne. This all happened while all three guys were still in the car. Nunez punched the guy in the back seat and the three guys drove off about 10 feet. The car then stopped. Nunez fired one shot into the window of the car and one shot over the car. The car then drove away.

The State rested. Defendant made a motion for a directed finding which the trial court denied.

Defendant testified on his own behalf. Defendant stated that at approximately 1 a.m. on September 5 Greg came to his house asking for Yvonne. The defendant's nephew went to the door. Nunez had told his nephew to tell whoever was knocking that he wasn't there. Neither Nunez nor Yvonne talked to Greg at that time. The next time Nunez saw Greg was at approximately 3:30 a.m.

At about 3:30 a.m., Nunez was walking Yvonne to her car when Jacobo drove up alongside him. Nunez stated that he did not argue with Greg, but rather he just told them if they wanted to talk to Yvonne, she was on her way home and they could talk to her there. At that point Davis became involved in the conversation and proceeded to get out of the car. Greg opened the car door for Davis and slouched forward while Davis proceeded to pull himself from the side seat of the car. When Davis started to get out of the car, Nunez

struck him. Nunez punched him once, but Davis put his hand in the way. After Nunez struck him once, Davis backed up away from the car. The car moved about 10 feet, stopped, and both the doors opened. Before anyone got out of the car, Nunez took a shot. He shot once at the car and once in the air. When asked if he had seen any weapons on any of the men, he stated, "No. There was a baseball bat in the back seat of the car." The three men had not threatened him prior to his pulling the weapon. Nunez was scared because there were three guys and he was only with Yvonne.

On September 10, 1991, at approximately 2 a.m., he was inside his house eating. He then walked outside and there was a detective car outside. He was subsequently taken to the police station where he had a conversation with Detective Crescenzo and ASA Wynne.

On cross-examination, the defendant testified that he was standing about 10 to 12 feet away from the car when he fired the gun. The car had come to a complete stop, and the doors had opened before he took his first shot. He did not use the first shot to warn the men, he fired directly into the back window of the car. He believed Jacobo was intending to get out. When asked if he saw Jacobo's body at the driver's side, he stated that he didn't see anything at that time. Nunez was scared for himself that they were all drunk. The men smelled like liquor and the car smelled like wicked stick. However, Nunez testified he knew there were three human beings in the car and that he knew by firing the gun into the car he could hit one of the people.

On redirect, Nunez testified that he brought the gun out of the house because he "was scared that they were going to be out there, and they were going to attempt something on [him]." He stated he was scared because although Greg had started seeing Yvonne again, she didn't want to go out with him; however, he kept persisting and bothering her and stuff like that. The defendant did not intend to hit anybody when he fired the one shot into the back of the car; he intended to scare the men.

The defendant rested.

The State waived its closing argument, defense counsel presented a closing argument and the State argued in rebuttal.

The trial court found the defendant not guilty of attempted first degree murder. However, the defendant was convicted of armed violence, aggravated battery with a firearm and two counts of aggravated battery.

The defendant presents the following issues for review: (1) whether the defendant was denied his sixth amendment right to the effective assistance of counsel; (2) whether the trial court erred in

sentencing the defendant to 14 years' imprisonment; and (3) whether the matter must be remanded for resentencing.

## I

Defendant argues that he was denied his sixth amendment right to the effective assistance of counsel.

As a general rule, in order for a defendant to successfully demonstrate that his counsel's errors rose to the level of ineffective assistance, he must establish that counsel's performance fell below an objective standard of reasonableness and that, but for this substandard performance, there is a reasonable probability that the outcome of the trial would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 687-94, 80 L. Ed. 2d 674, 693-98, 104 S. Ct. 2052, 2064-68; *People v. Martin* (1992), 236 Ill. App. 3d 112, 120, 603 N.E.2d 603, 608.) After a review of the record in this case, we cannot say that defendant was prejudiced by defense counsel's performance and that a reasonable probability exists that the outcome of the trial would have been different.

However, defendant relies on the court's reasoning in *United States v. Cronic* (1984), 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039, and argues his trial counsel was ineffective in that she did not conduct a meaningful cross-examination of prosecution witnesses, called Nunez as a witness and elicited highly prejudicial, inculpatory testimony, and entirely failed to subject the prosecution's case to any meaningful adversarial testing. In *United States v. Cronic* (1984), 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039, the United States Supreme Court held, "[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." (*Cronic*, 466 U.S. at 659, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047.)

> "When a true adversarial criminal trial has been conducted— even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated." *Cronic*, 466 U.S. at 656-57, 80 L. Ed. 2d at 666, 104 S. Ct. at 2045-46.

For the following reasons, we find that defendant has failed to establish ineffective assistance of counsel under *Cronic*.

Defendant also relies on *People v. Hattery* (1985), 109 Ill. 2d 449, 488 N.E.2d 513, and *People v. Salgado* (1990), 200 Ill. App. 3d 550, 558 N.E.2d 271. However, we find both *Hattery* and *Salgado* factually distinguishable from the present case.

In *Salgado*, the defendant, Salgado, was charged with residential burglary and theft along with two codefendants. At trial neither the prosecutor nor defense counsel made an opening statement. Defense counsel did not cross-examine the complainant or investigating police officer. Although neither of his codefendants testified at trial, defendant's attorney called defendant as a witness and during direct examination elicited a confession to the offense of residential burglary. In addition, defense counsel presented no defense other than to assert during closing argument that defendant had a right to explain his participation in the crime. The trial court found Salgado guilty of residential burglary and his codefendants guilty of theft. In entering judgment, the trial judge stated that prior to defendant's testimony, he anticipated finding defendant guilty of theft, but because defendant admitted that he committed the residential burglary, the court had no choice but to convict him of that offense. The appellate court found ineffective assistance of counsel. *Salgado*, 200 Ill. App. 3d 550, 558 N.E.2d 271.

The defendant in *Hattery* was charged with the murder of a mother and her two small children. During the opening statement, defense counsel made an unequivocal concession to the murder charge and defendant's eligibility for the death penalty. Counsel had stated that the only question in the case was whether the death penalty should be imposed. Throughout the trial, defense counsel advanced no theory of defense, presented no evidence of their own, made no closing argument or any attempt to hold the State to its burden of proof. Through cross-examination of the State's witnesses, defendant attempted to demonstrate that defendant's actions were the product of compulsion. The supreme court found ineffective assistance of counsel. *Hattery*, 109 Ill. 2d 449, 488 N.E.2d 513.

Matters of trial strategy will not be held to constitute ineffective assistance, but acts or omissions by counsel will not be considered matters of strategy where there is no sound tactical reason that could conceivably support the act or omission. (*People v. Garza* (1989), 180 Ill. App. 3d 263, 269, 535 N.E.2d 968.) The accused is entitled to competent, not perfect, representation, and the fact that a defense tactic was unsuccessful does not retrospectively demonstrate incompetence. (*People v. Schmidt* (1988), 168 Ill. App. 3d 873, 882, 522 N.E.2d 1317, 1323.) Competency of counsel should be judged from the totality of his conduct and not on the basis of what appellate counsel might have done in his stead. *People v. Jennings* (1986), 142 Ill. App. 3d 1014, 492 N.E.2d 600.

■ In arguing that defense counsel failed to subject the prosecution's case to a meaningful adversarial testing, Nunez points to

defense counsel's allegedly defective cross-examination of the prosecution witnesses.

First, defendant points to the fact that after Jacobo gave an account of the shooting on direct examination, defense counsel's cross-examination entirely omitted any challenge to the testimony concerning the actual shooting. In *People v. Melgoza* (1992), 231 Ill. App. 3d 510, 542-43, 595 N.E.2d 1261, 1285, the court found that defense counsel was not ineffective in failing to conduct an aggressive cross-examination of the State's witnesses where the defendant did not show that as a result of a more aggressive cross-examination, the witnesses' testimony would have been favorable to his defense or that the results would have been different. Nunez has not demonstrated that had defense counsel's cross-examination of the prosecution's witnesses been more aggressive, the testimony would have been favorable to his defense or that the results would have been different. Defense counsel may also have felt that Jacobo told his version of events credibly and did not want to reinforce this testimony with the judge.

Second, defendant points to the cross-examination of Jacobo and Davis concerning their use of drugs or alcohol and claims that defense counsel failed to follow through in any pointed or purposeful way, asking only perfunctory, preliminary questions regarding Jacobo's, Davis' and their companion's alcohol and drug consumption at the time of the incident. Defendant asserts that the only meaningful questions defense counsel asked were related to Jacobo's and Davis' consumption of beer and use of drugs immediately preceding the shooting incident. Defendant argues that by failing to subject the prosecution's case to meaningful adversarial testing, defense counsel thus forfeited the opportunity to substantiate Nunez's assertion of self-defense based on the trio's aggressive, threatening, possible alcohol- or drug-related, behavior toward Nunez.

During cross-examination, defense counsel asked Jacobo if he had been drinking that night. Jacobo responded yes, that he had been drinking beer. When asked if he had been smoking happy stick, Jacobo responded no.

During cross-examination of Davis the following colloquy occurred:

"Q. [Defense counsel:] How much had you had to drink that night?
A. I probably drank a full pack.
THE COURT: How much?
THE WITNESS: Probably 12 cans of beer.
BY [Defense Counsel:]

Q. Had you been smoking something called wicked stick or happy stick?

A. No."

Defendant maintains defense counsel's cross-examination of Davis on the questions of alcohol and drug consumption was lacking, with the court providing the only level of probity. However, as the testimony discloses, defense counsel elicited testimony that Davis "drank a full pack." Immediately after this response the court asked, "How much?" As far as this court can determine from this record, defense counsel did not have the opportunity to ask that same question, prior to the time that the trial judge did so, and the fact remains that the information was brought out on cross-examination.

Again, Nunez has not demonstrated that had defense counsel's cross-examination been more aggressive, the testimony would have been favorable to his defense or that the results would have been different. See *Melgoza*, 231 Ill. App. 3d at 542-43, 595 N.E.2d at 1285.

Defendant asserts that "[i]t should not be forgotten that both Jacobo and Davis had been convicted of a felony for being in possession of a controlled substance" and that the credibility of a thrice-convicted felon (Jacobo) and a four-time convicted felon (Davis) was never challenged. The fact that both these men were convicted felons, and specifically that they previously had been convicted of possession of a controlled substance, was brought out on direct examination by the prosecutor. In fact this information was brought out at the conclusion of direct examination, immediately preceding cross-examination. This was a bench trial. The trial court heard this testimony and had the opportunity to determine what weight to give the witnesses' testimony in light of this information. We can perceive of no reason for defense counsel to assume the trial judge completely ignored this testimony. Defense counsel's election not to pursue additional questions regarding the witnesses' prior convictions was clearly a matter of trial strategy.

Defendant argues the adversarial process was totally lacking during cross-examination of prosecution witnesses where defense counsel merely parroted the prosecutor's line of inquiry, the result being a reinforcement and resubstantiation of the State's evidence. This was a matter of trial strategy. First, these were not the only questions that defense counsel asked. Second, asking similar questions to and in the same sequence as did the prosecutor may have revealed inconsistencies in the testimony where the witness was forced to tell the same story twice, or, on the other hand, may have revealed no inconsistencies which could have the effect of making the witness appear to be overrehearsed.

Although defendant does admit defense counsel did not concede Nunez's guilt directly, defendant maintains that by the authority of *Salgado* and *Hattery*, this court should find prejudice to Nunez where defense counsel served as a catalyst for Nunez's confession of guilt during Nunez's direct examination. Defendant argues that defense counsel also failed her adversarial role where she called Nunez as a witness when, in light of Nunez's testimony, there was no reason to do so.

■ We find *Salgado* inapplicable to the case at bar. (See *Salgado*, 200 Ill. App. 3d 550, 558 N.E.2d 271.) This was not an instance where defense counsel conceded defendant's guilt and failed to provide an effective defense. Defense counsel was put in the position of representing a defendant who signed a statement wherein he admitted to firing a shot into a car which he was aware three people were in. Defense counsel attempted to present a self-defense theory of defense. Defendant testified that he was scared that there were three against one. The defense theory was not that defendant did not commit the shooting, but rather that he was somehow justified in doing so. In asserting this defense, defendant must show that "he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm." (Ill. Rev. Stat. 1991, ch. 38, par. 7—1.) Defendant's perceptions were important to this defense. The prosecution had already presented the defendant's signed statement in which defendant admitted to firing a gunshot into the window of the car. In light of the theory of defense, it would have been reasonable for defense counsel to have defendant testify.

Defendant further argues that pursuant to *Hattery*, this court should find prejudice to Nunez where no evidence exists in the record on appeal that Nunez agreed to defense counsel's strategy that Nunez confess to the offenses charged during his direct examination. (See *Hattery*, 109 Ill. 2d 449, 488 N.E.2d 513.) Defendant argues that equally important is the silence of the record on appeal that defense counsel had advised Nunez not to testify because of the expected damaging nature of Nunez's testimony.

In *Hattery* the court stated:

"Defense counsel's trial strategy—which attempted to show that defendant was guilty of murder but undeserving of the death penalty—was totally at odds with defendant's earlier plea of not guilty. There is no evidence that defendant consented to his attorneys' strategy, and such consent will not be presumed from a silent record. [Citation.] As such, counsel's actions deprived defen-

dant of the right of having the issue of his guilt or innocence presented to the jury as an adversarial issue." (*Hattery*, 109 Ill. 2d at 464, 488 N.E.2d at 519.)

However, the court went on to state:

"Counsel may not concede his client's guilt in the hope of obtaining a more lenient sentence where a plea of not guilty has been entered, unless the record adequately shows that defendant knowingly and intelligently consented to his counsel's strategy." *Hattery*, 109 Ill. 2d at 465, 488 N.E.2d at 519.

In the present case defense counsel attempted to present a theory of self-defense. Moreover, Nunez's testimony followed the admission of his signed statement. Defense counsel did not concede Nunez's guilt. We find these actions distinguishable from *Hattery*, where defense counsel clearly conceded defendant's guilt.

Defendant argues that nearly every other aspect of the representation of Nunez by defense counsel manifests a failure to subject the prosecution's case to any meaningful adversarial testing: (1) no motions were filed to challenge the warrantless arrest of Nunez at his home or to challenge his alleged statement regarding the incident; (2) opening statement was waived; (3) no argument was made to support the motion for a directed finding; (4) no argument was offered concerning the motion for a new trial; and (5) the motion for a new trial was a form motion in that it included allegations involving a jury.

■ First, whether defense counsel's failure to make a motion to suppress is *per se* incompetence depends on the circumstances of each case. (*People v. Fernandez* (1987), 162 Ill. App. 3d 981, 987, 516 N.E.2d 366, 370.) Defendant has offered no argument other than to state that defense counsel failed to file such a motion. As such defendant has not alleged any reasons which would have supported the filing of such a motion or that such a motion would have had any probability of success. Generally, the filing of pretrial motions is considered a matter of professional judgment and, as such, trial tactics which are beyond the scope of an appellate review of defense counsel's competence. *People v. Martin* (1992), 236 Ill. App. 3d 112, 121, 603 N.E.2d 603.

Second, repeatedly, Illinois courts have found that the waiver of an opening statement is clearly a matter of trial strategy. (*People v. Jennings* (1986), 142 Ill. App. 3d 1014, 1028, 492 N.E.2d 600.) Defense counsel waived her opening statement only after the prosecutor waived his opening statement. In addition, this was a bench trial and not a jury trial. Defendant has not shown that making an opening statement would have affected the outcome of the trial.

Third, defendant has not alleged that argument on the motion for a directed finding would have resulted in a different result. The decision whether or not to argue the motion was a matter of trial strategy.

Fourth, defense counsel's decision not to argue the motion for a new trial was a matter of trial strategy. This was a bench trial. The trial judge who heard the trial testimony was ruling on the motion for a new trial. Prior to rendering his ruling on the motion, the judge specifically noted that his recollection was refreshed as to this matter. Defendant has not alleged that argument on the motion for a new trial would have resulted in a different result.

Fifth, although we do not condone the use of the obvious form motion for a new trial, we cannot say that defendant was prejudiced in this case. The motion alleged, *inter alia*, defendant was not proved guilty beyond a reasonable doubt, the verdict was against the manifest weight of the evidence, the State failed to prove every material allegation of the offense beyond a reasonable doubt and the court erred in overruling the defendant's motion for a directed finding at the close of the State's case.

Finally, defendant points to the following remark made during closing argument and argues that defense counsel did not seem to understand the possible sentences for the offense with which Nunez was charged. During closing argument, defense counsel stated:

> "And so we ask for a finding of not guilty on the armed violence. At the most Judge, what you have here is an aggravated battery with a fire arm [sic]. He shot the gun. He admits that he did and it did, in fact, strike somebody causing great bodily harm."

Defendant argues that defense counsel, by her argument, would seem to advocate a finding of guilty for aggravated battery with a firearm for Nunez. However, defendant fails to point out that immediately preceding this statement, defense counsel argued that there was no intent to kill and asked for a finding of not guilty on the attempted murder charge. In addition, defense counsel argued defendant's actions did not constitute armed violence in that he did not arm himself with the intent to commit a felony, rather he armed himself for protection. "In situations where there is overwhelming evidence of guilt and no defense, if counsel contests all charges he is liable to lose credibility with the trier of fact when it comes to charges where a legitimate defense exists." *People v. Johnson* (1989), 128 Ill. 2d 253, 270, 538 N.E.2d 1118.

Defense counsel did not outright ask for a conviction on the aggravated battery with a firearm charge and defense counsel had a defense as to the attempted murder charge. Although defense counsel

could have chosen her words more carefully, in light of the overwhelming evidence of defendant's guilt, we do not believe that the comment unduly prejudiced the defendant.

The record as a whole satisfies us that the State's case was subjected to a meaningful adversarial testing. Defense counsel was placed in the position of representing a defendant who had made a statement that he had fired a shot into a car in which he was aware that there were three individuals. The State provided two eyewitnesses to the shooting. This was not an instance where defense counsel conceded defendant's guilt and failed to provide an effective defense. In the present case, in light of the competent, if imperfect, representation and the overwhelming evidence of guilt, we believe that the prosecution's case was subjected to a meaningful adversarial testing and we do not find that the defendant was denied his sixth amendment right to effective assistance of counsel.

## II

In his second assignment of error the defendant argues the trial court erred in sentencing defendant to 14 years' imprisonment by relying upon erroneous and improper information and by repeatedly stating that Nunez's use of drugs caused or contributed to Nunez's shooting of an individual, where the evidence adduced at trial revealed that Nunez shot at three individuals because of fear of harm to himself and that no evidence was presented at trial that Nunez had used, or was under the influence of, drugs at the time of the shooting incident.

The shooting incident occurred on September 5, 1991. Subsequently, on December 17, 1991, Nunez was arrested and charged with possession of a controlled substance. On June 16, 1992, prior to trial in the instant case, the defendant was placed on 30 months' probation for possession of a controlled substance. As a condition of probation, the defendant was required to provide weekly urine samples for laboratory analysis to ascertain the presence of drugs. The defendant's presentence report in the instant case indicated the defendant admitted to first using marijuana at age 12 and cocaine at age 22 and that defendant stated that he only used cocaine and marijuana one to two times per month. However, the report further indicated the defendant's urine drop results were as follows: on July 1, 1992, defendant tested positive for cocaine and marijuana, on July 8 and 24, 1992, the defendant tested positive for cocaine, and that the positive drops for cocaine and marijuana continued until his last drop on January 1, 1992. The defendant never dropped negative and the defendant continued to state that he did not have a drug problem.

At the time of sentencing the trial court stated:

"THE COURT: Mr. Nunez, the type of mistake you made is, first of all, having a gun; secondly, having drugs—using drugs, I should say, for a substantial period of time.

According to the Pre-sentence Report, you have been using drugs for a long time, beginning with marijuana at age twelve. Although you claim you don't have a problem and you told the probation officer you don't have a problem, you dropped positive for cocaine and marijuana every single time since I put you on probation.

Now, what that meant was that you were out of control in your use of drugs. You have a very severe drug problem, because you continue to use, even though you knew the Judge was going to find out. And the Judge had found out. And the Judge now sees somebody standing in front of him who still, in this last report, which has been done since November 30th, claims he doesn't have a drug problem.

This person who stands before the Judge has a mammoth problem. Cocaine and alcohol cause violent actions. They cause unreasonable use of judgment. They impair your ability to think like a normal human being.

And your good friend, the gun, and your good friend, the drugs, are not going to serve the time: you're going to serve the time.

Now, you can do something with this time, and I'm going to sentence you for a substantial period of time, in order to demonstrate very clearly that the use of guns, coupled with drugs in our society, is a menace to our society.

\*\*\*

The sentencing range for this offense is six to thirty years in the penitentiary. The way you handled this, what you did is call out, in disregard for human life.

Having considered all those facts and circumstances, I sentence you to fourteen years in the Illinois Department of Corrections and three years mandatory supervised release."

It is firmly established that the trial court's judgment with regard to the appropriate punishment is entitled to great deference. (*People v. Illgen* (1991), 145 Ill. 2d 353, 379, 583 N.E.2d 515, 526.) This is so because the trial judge is able to make a reasoned judgment based upon firsthand consideration of such factors as defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age; a position far superior to that of this court reviewing a cold record. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, 884.) A reviewing court cannot alter a sentence absent an abuse of discretion on the part of the trial judge. (*People v. Step-*

*pan* (1985), 105 Ill. 2d 310, 323, 473 N.E.2d 1300; *Perruquet*, 68 Ill. 2d at 154, 368 N.E.2d at 883.) A reviewing court must not substitute its judgment for that of a sentencing court merely because it would have weighed the factors differently. (*People v. Pittman* (1982), 93 Ill. 2d 169, 178, 442 N.E.2d 836, 840.) There is no requirement that the minimum sentence be imposed in the absence of aggravating factors. (*People v. Barney* (1982), 111 Ill. App. 3d 669, 679, 444 N.E.2d 518, 525.) A reviewing court may not change or reduce a sentence on the ground that it is too severe unless it can be affirmatively demonstrated that the trial court relied on erroneous or improper evidence in imposing sentence. *People v. Ellis* (1989), 187 Ill. App. 3d 295, 303, 543 N.E.2d 196, 201.

In making its sentencing decision, a trial court shall consider any presentence reports. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—4—1(a)(2).) The trial court is authorized to consider not only the defendant's character, but also the nature and circumstances of the offense, and it may further consider the defendant's social environment, habits and age. (*People v. Tarala* (1987), 153 Ill. App. 3d 199, 201, 505 N.E.2d 1284, 1285.)

> "[T]he trial court may search anywhere, within reasonable bounds, for facts which tend to aggravate or mitigate the offense, and this inquiry is limited only by the prerequisite that the information considered be accurate and reliable [citation], and it may also consider pending charges against a defendant [citation]." *Tarala*, 153 Ill. App. 3d at 201, 585 N.E.2d at 1286.

The State argues that the trial court's statement does not indicate that the judge assumed defendant was on drugs at the time of the offense, but rather it merely shows that the trial court felt that the defendant had two distinct problems, guns and drugs.

In addition, the State points to the fact that the trial judge has determined that not only does defendant have a major drug problem, but the fact that he denies the problem creates a larger problem. In *People v. Leckrone* (1985), 134 Ill. App. 3d 978, 983, 481 N.E.2d 343, 347, the court held that "consideration of defendant's truthfulness is clearly a proper factor in sentencing."

■ The trial court had the opportunity to determine the demeanor and credibility of the defendant. In addition, it properly considered the information contained in the presentence report regarding defendant's continued drug use. As the State argued, we believe that the trial court was considering the use of drugs in addition to the shooting incident. We do not believe the record indicates that the trial court sentenced the defendant based on the belief that defendant was under the influence of drugs at the time of the shooting. Finally, the sentence here is clearly within the statutory guidelines.

Accordingly, for the reasons set forth above, we find that the trial court did not utilize improper factors in determining defendant's sentence for a Class X offense. However, for the reasons set forth below, the matter is remanded for resentencing as the record is not clear as to which offense the defendant was sentenced.

### III

In his third assignment of error the defendant argues that the judgment of the court must be vacated and remanded for resentencing where the offenses for which the defendant was found guilty arose from the same physical act and the report of proceedings is silent as to which offense the defendant was sentenced.

During the hearing in aggravation and mitigation, no statement was made by the trial court judge, the assistant State's Attorney, or defense counsel concerning the specific offenses for which Nunez was being sentenced. The trial judge merely stated, "The sentencing range for this offense is six to thirty years in the penitentiary." He stated that he sentenced defendant to "fourteen years in the Illinois Department of Corrections and three years mandatory supervised release." The orders entered reflect that Nunez was found guilty of counts II through V, armed violence, aggravated battery with a firearm, and two counts of aggravated battery. The order of sentence and commitment to the Illinois Department of Corrections indicates Nunez was sentenced to a term of 14 years in the Illinois Department of Corrections with three years MSR (mandatory supervised release) to be served concurrently on each count. The order lists the offenses of armed violence (Ill. Rev. Stat. 1991, ch. 38, par. 33A—2), aggravated battery with a firearm (Ill. Rev. Stat. 1991, ch. 38, par. 12—4.2(a)), and aggravated battery (Ill. Rev. Stat. 1991, ch. 38, par. 12—4(a)).

Defendant maintains that since all the crimes for which Nunez was convicted are based upon the same physical act of Nunez shooting Jacobo, the findings of guilty must be vacated as to all counts except one. (See *People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844.) Defendant argues that, under *King*, easily disposed of are counts IV and V, wherein Nunez was found guilty of aggravated battery. The remaining offenses of armed violence and aggravated battery with a firearm are both Class X felonies. (Ill. Rev. Stat. 1991, ch. 38, pars. 12—4.2(b), 33A—3.) Defendant maintains that since the convictions for both of these offenses arise from the same physical act, one of the findings of guilty must also be vacated. Defendant asks this court to vacate the armed violence count and remand the matter for resentencing on the single count of aggravated battery with a firearm.

■ The State acknowledges that under the circumstances in this case only the most serious charge can remain and, thus, three of the findings must be vacated. The State agrees with defendant's remedy to vacate the armed violence count and both counts of aggravated battery, leaving only the conviction for aggravated battery with a firearm to stand. However, the State disputes defendant's contention that he must be resentenced.

The State argues that the trial court, in sentencing defendant to one term of 14 years' imprisonment, indicated that it was aware that defendant was only to receive one sentence for his one act and thus, since defendant was properly sentenced, the matter need not be remanded for resentencing.

We believe that the better procedure is to remand the matter for resentencing. The trial court's sentencing order must be corrected as it indicates that Nunez was sentenced to 14 years' imprisonment plus three years' mandatory supervised release concurrent on each count of armed violence, aggravated battery with a firearm and aggravated battery. Whether the trial judge was aware of the fact that Nunez could only be sentenced on one charge is not apparent. Whether the trial judge was aware of the fact that he could only sentence on the most serious charge is not apparent. Just as a trial judge has discretion in sentencing, he should be permitted to determine the effect, if any, of any errors in his sentencing.

In addition, although the order of sentencing indicates Nunez was to be given credit for 99 days served in custody while waiting trial, the order attached to Nunez's brief merely indicates that defendant was sent to the Illinois Department of Corrections for 14 years and credit was to be given for time in custody. This should also be corrected.

For all the reasons set forth above, we affirm Nunez's conviction, vacate the order of sentencing, and remand the matter to the trial court with directions to resentence the defendant solely on the count of aggravated battery with a firearm.

Affirmed in part; vacated and remanded in part.

GORDON and COUSINS, JJ., concur.